FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>SALVADOR REYES VERA, AKA<br>Magic, AKA Albert Vera Reyes,<br>AKA Sas, AKA Salvador Vera,<br>*Defendant-Appellant*. | No. 12-50294<br><br>D.C. No.<br>8:08-cr-00280-<br>JVS-1 |
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>ARMANDO REYES VERA, AKA<br>Mando, AKA Armando Vera,<br>*Defendant-Appellant*. | No. 12-50366<br><br>D.C. No.<br>8:08-cr-00280-<br>JVS-2<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
May 12, 2014—Pasadena, California

Filed October 22, 2014

Before: John T. Noonan, Jr., Kim McLane Wardlaw
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

**SUMMARY**[*]

**Criminal Law**

The panel affirmed in part and vacated in part the district court's judgments, and remanded for further proceedings in a case in which Salvador Reyes Vera and Armando Reyes Vera were convicted of a drug conspiracy and use of a minor to commit a drug trafficking offense.

Two case agents testified at the defendants' joint trial, one as a gang expert and the other as an expert in drug jargon who translated wiretapped phone calls into drug quantities and amounts. The panel affirmed the admission of the gang testimony. But because the testimony interpreting the recorded calls intermingled lay and expert opinion, the panel held that the district court's failure to explain the distinction to the jury constituted plain error. The panel held that this intermingling resulted in the admission of improper expert and lay opinions, which also constituted plain error. Because these errors affected the drug quantities found by the jury in a special verdict, and therefore the mandatory minimum sentences the defendants faced, the panel held that they affected the defendants' substantial rights and seriously

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

affected the fairness of the judicial proceedings. The panel therefore vacated the drug quantity findings and the defendants' sentences. The panel affirmed the remainder of the jury verdict.

The panel also addressed the appropriate remedy when trial errors affect the jury's drug quantity findings but not the underlying conspiracy convictions. Because drug quantity is not an element of the conspiracy offense, the panel did not vacate the defendants' conspiracy convictions. The panel further held that, under these circumstances, the Double Jeopardy Clause does not preclude retrial of the drug quantity issue. The panel therefore vacated the special verdict only, and remanded for proceedings. The panel wrote that on remand the government may elect to retry the drug quantity issue or may seek a resentencing based solely on the defendants' convictions.

**COUNSEL**

Gretchen Fusilier, Carlsbad, California, for Defendant-Appellant Salvador Reyes Vera.

Thomas Paul Sleisenger, Los Angeles, California, for Defendant-Appellant Armando Reyes Vera.

André Birotte Jr., United States Attorney, Robert E. Dugdale, Chief, Criminal Division, Dennise D. Willett, Chief, Santa Ana Branch Office, Michael Anthony Brown (argued), Assistant United States Attorney, United States Attorney's Office, Santa Ana, California, for Plaintiff-Appellee United States of America.

**OPINION**

FISHER, Circuit Judge:

This appeal requires us to revisit issues that arise when law enforcement officers offer both expert and lay opinion testimony interpreting the meaning of intercepted telephone calls. We again emphasize that such expert opinions must rest on reliable methodology; that such lay opinions may not be supported by speculation or hearsay, or interpret unambiguous, clear statements; and that the jury must be instructed on how to appropriately evaluate each form of testimony offered by the officer.

Defendants Salvador Reyes Vera and Armando Reyes Vera appeal their convictions and sentences for drug conspiracy and use of a minor to commit a drug trafficking offense.[1] Two case agents testified at the defendants' joint trial, one as a gang expert and the other as an expert in drug jargon who translated wiretapped phone calls into drug quantities and amounts. We affirm the admission of the gang testimony but reach a different conclusion regarding the testimony interpreting the recorded calls. Because that testimony intermingled lay and expert opinion, the district court's failure to explain the distinction to the jury constituted plain error. Additionally, this intermingling resulted in the admission of improper expert and lay opinions, which also constituted plain error. Because these errors affected the drug quantities found by the jury in a special verdict, and therefore the mandatory minimum sentences the defendants faced, they affected the defendants' substantial rights and seriously

---

[1] Following the practice adopted in the parties' briefing, we refer to the defendants by their first names, Salvador and Armando.

affected the fairness of the judicial proceedings. Accordingly, we vacate the drug quantity findings and the defendants' sentences. We affirm the remainder of the jury verdict.

We also address the appropriate remedy when trial errors affect the jury's drug quantity findings but not the underlying conspiracy convictions. Because drug quantity is not an element of the conspiracy offense, we need not vacate the defendants' conspiracy convictions. We further hold that, under these circumstances, the Double Jeopardy Clause does not preclude retrial of the drug quantity issue. We therefore vacate the special verdict only, and remand for proceedings consistent with this opinion. On remand, the government may elect to retry the drug quantity issue or may seek a resentencing based solely on the defendants' convictions.[2]

## I. Background

In 2007, acting on a tip from confidential informant Gerardo Reyes, the Santa Ana Gang Task Force began investigating drug trafficking in Bishop Manor, a high-density apartment complex within the territory of the Minnie Street Lopers gang. Reyes' tip and the resulting investigation brought the defendants to the task force's attention. Based on the tip, some initial surveillance and a few initial controlled purchases, the agents believed that Salvador and Armando were involved in the illegal distribution of several controlled substances. To further the investigation, in May 2008, the task force began wiretapping cell phones used by the

---

[2] For the reasons given in a concurrently filed memorandum disposition, we reject the defendants' sufficiency of the evidence and sentencing arguments.

defendants and their minor nephew, Ramon Vera, also known as "Ojitos" or "Little Bear." All told, the investigation intercepted thousands of calls and, through contemporaneous surveillance, corroborated certain aspects of the calls – for example, who the speakers were and where they were meeting. Reyes also completed a controlled purchase from Armando of around 24 grams of heroin, the only physical evidence of narcotics seized during the investigation.

The Vera brothers were arrested in October 2008 and indicted a few months later, as were several co-defendants. In January 2012, a federal grand jury returned a three-count superseding indictment against the defendants. Count 1 charged Salvador and Armando with conspiracy to distribute and to possess with intent to distribute heroin, cocaine, cocaine base and methamphetamine.[3] Counts 2 and 3 charged Salvador (Count 2) and Armando (Count 3) with using a minor to commit a drug trafficking offense. *See* 21 U.S.C. §§ 841(a)(2), 846, 861(a)(1).

The wiretapped phone calls were the government's primary evidence during the five-day trial; over 70 recorded calls were either played for or read to the jury. Additionally, the two case agents primarily responsible for the investigation were called to testify. FBI Agent Daniel Lavis, the government's key witness, testified about the investigation, the surveillance that was conducted, narcotics prices, how law enforcement agents use confidential informants, Bishop Manor and the surrounding area, how wiretaps are obtained and how they work, phone technology, the phones that were wiretapped in this case, the identity of participants in the

---

[3] At trial, the methamphetamine allegations were withdrawn from the jury's consideration.

wiretapped calls and their relationships, and code words used by the participants in the wiretapped calls. Lavis also opined about the meanings of most of the recorded calls as they were played or read, identifying voices and nicknames, and interpreting the conversations as referring to specific quantities of particular controlled substances. The other case agent, Detective John Franks, testified about gang structure and practices generally, the Minnie Street Lopers specifically, and the inferences he drew about Salvador's role within the Lopers organization. Franks also testified about the investigation and his observations while conducting surveillance.

Reyes, the confidential informant, testified as well. He gave details regarding the controlled purchase of heroin he made from Armando and explained the structure of the defendants' drug dealing organization, from which he had purchased drugs for many years and for which he had, at times, acted as a lookout. He further explained that Salvador was the highest ranking member of the Minnie Street Lopers gang in the area. Reyes testified that Salvador maintained control of narcotics trafficking in that area by giving only certain dealers permission to sell narcotics. Anyone else caught dealing would be "beat up." Reyes testified that Armando was Salvador's "number two man" and handled most sales, and that Salvador used his nephew and other minors as drug runners.[4]

---

[4] The remaining government witnesses gave very little substantive testimony. These witnesses included three language specialists who had translated the recorded calls from Spanish; a forensic chemist who testified about the substance Reyes purchased from Armando; two police officers who conducted surveillance and traffic stops; and a police officer who cited Ramon for being out after curfew, confirming he was a minor.

The defense did not call any witnesses or introduce any evidence except a stipulation that a particular intercepted phone call did not concern cocaine base, as Lavis had testified, but actually concerned powder cocaine. The defendants essentially conceded guilt on the conspiracy count, focusing their closing arguments on the adequacy of the government's proof of drug type and quantity, and characterizing the jury's role as answering "an accounting question."

The jury found the defendants guilty on all counts and issued a special verdict holding both defendants responsible for 100 grams or more of heroin, 500 grams or more of cocaine and 280 grams or more of cocaine base. Both defendants were sentenced to the low end of their respective guidelines ranges: 360 months' imprisonment for Salvador and 210 months' imprisonment for Armando.

## II. Franks' Testimony

The defendants contend that Detective Franks' testimony as both a gang expert and a percipient witness to the events in his investigation violated their Confrontation Clause rights and Federal Rule of Evidence 403.[5] We review the district

---

[5] We reject the defendants' argument that admitting this evidence violated the Due Process Clause. The admission of evidence violates due process only when "there are *no* permissible inferences the jury may draw from the evidence" and that evidence is "of such quality as necessarily prevents a fair trial." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)) (internal quotation marks omitted). The gang testimony was probative of Salvador's control over drug transactions in Bishop Manor in which he did not directly take part. Because Armando was Salvador's "number two man," establishing that Salvador controlled the drug trafficking organization allowed the jury to infer that Armando managed

court's rulings on the Confrontation Clause de novo and on Rule 403 for abuse of discretion. *See United States v. Gomez*, 725 F.3d 1121, 1125 (9th Cir. 2013); *United States v. Hankey*, 203 F.3d 1160, 1166–67 (9th Cir. 2000). We hold that admitting Franks' gang testimony did not constitute reversible error.

## A. Confrontation Clause

The Supreme Court held in *Crawford v. Washington*, 541 U.S. 36 (2004), that a defendant's Confrontation Clause rights are violated by the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination." *Id.* at 53–54. Nevertheless, an expert witness may offer opinions based on such inadmissible testimonial hearsay, as well as any other form of inadmissible evidence, if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. Moreover, the expert may disclose to the jury the inadmissible evidence relied on in forming his opinion "if [its] probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect." *Id.*

Under these rules, there is generally no *Crawford* problem when an expert "appli[es] his training and experience to the sources before him and reach[es] an independent judgment." *Gomez*, 725 F.3d at 1129 (quoting *United States v. Johnson*,

---

the daily activities of a larger operation, thus widening the scope of the conspiracy. Additionally, Franks' testimony on this point dovetailed with Reyes' testimony, thereby somewhat "rehabilitat[ing] (without vouching for)" Reyes' credibility, which had been thoroughly impeached. *United States v. Bighead*, 128 F.3d 1329, 1331 (9th Cir. 1997).

587 F.3d 625, 635 (4th Cir. 2009)).  But an expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he "is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation."  *Id.* (quoting *Johnson*, 587 F.3d at 635).  Accordingly, the key question for determining whether an expert has complied with *Crawford* is the same as for evaluating expert opinion generally: whether the expert has developed his opinion by "applying his extensive experience and a reliable methodology."  *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003).

The Second Circuit's opinion in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), illustrates how case agent expert testimony can violate a defendant's Confrontation Clause rights.  The defendants in *Mejia* were members of the MS-13 gang who were being tried for racketeering and related charges.  *See id.* at 183.  An agent qualified as a gang expert, *see id.* at 193–94, identified custodial interrogations of MS-13 members as at least a partial basis for his testimony "that MS-13 taxed non-member drug dealers," "that MS-13 treasury funds were used to purchase narcotics and that MS-13 members used interstate telephone calls to coordinate activities."  *Id.* at 199.  This testimony was directly relevant to several material issues in the case, including whether MS-13 was an enterprise, had an effect on interstate or foreign commerce or engaged in narcotics trafficking.  *See id.* at 200.

The agent's testimony violated the Confrontation Clause, however, because he presented testimonial hearsay "in the guise of an expert opinion," *id.* at 199 (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)), rather than presenting the information to explain a bona fide expert

opinion. The *Mejia* court was "at a loss in understanding how [the agent] might have 'applied his expertise' to these statements before conveying them to the jury." *Id.* Most problematically, the agent's drug tax testimony "was based directly on statements made by an MS-13 member in custody (during the course of this very investigation)." *Id.* (emphasis omitted). To form his drug tax opinion, therefore, the agent did not have to conduct a "synthesis of various source materials" or apply any of "his extensive experience [or] a reliable methodology." *Id.* at 197 (quoting *Dukagjini*, 326 F.3d at 58) (internal quotation marks omitted). Instead, the agent "communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." *Id.* at 198 (quoting *Lombardozzi*, 491 F.3d at 72). The agent's direct repetition of testimonial hearsay about the drug tax "impugn[ed] the legitimacy of all of his testimony," leading the court to suspect he had merely summarized an investigation conducted by others, rather than applying his expertise to draw his own conclusions. *Id.* at 199. The court therefore held that the agent's "reliance on and repetition of out-of-court testimonial statements made by individuals during the course of custodial interrogations violated [the defendants'] rights under the Confrontation Clause of the Sixth Amendment." *Id.*

Here, Detective Franks testified both as a gang expert witness and as a percipient witness regarding his observations during the investigation. Specifically, he testified that Bishop Manor fell within the territory of the Minnie Street Lopers gang and that the gang maintained control over narcotics sales within Bishop Manor and the surrounding areas by requiring any non-member drug dealers in the area to pay a tax. Because he knew from reviewing intercepted telephone calls that Salvador did not pay taxes to anyone else in the

neighborhood, Franks concluded that Salvador was "one of the leaders of the narcotics trade in Bishop Manor." He also testified about a recorded phone call between Salvador and a friend that was played for the jury, opining that a rival gang was trying to tax Salvador because they believed his friend was selling drugs within their territory. Because the leader of one neighborhood gang is generally the person who pays taxes to the higher-ranking gang in another area, Franks opined that Salvador was "[m]ore than likely the leader" of the Minnie Street Lopers in Bishop Manor.

The defendants contend that Franks exceeded the bounds of permissible expert testimony by "serving as a conduit for admission of hearsay in violation of *Crawford*." They argue that by testifying that the Minnie Street Lopers controlled narcotics trafficking within Bishop Manor and "were able to force non-members dealing drugs there to pay a tax," Franks directly "imparted important testimonial facts gleaned from his exposure to gang members and affiliates" without applying any independent judgment. *Id.* We disagree and hold that Franks' testimony fell within the bounds of permissible expert opinion.

First, Detective Franks applied his experience to his observations to form expert opinions about the Minnie Street Lopers and their tactics. Franks testified he had extensive training about and experience with gangs, including some formal classroom training, his time on the Santa Ana Gang Task Force and his work at the Santa Ana Police Department as a gang homicide investigator and gang suppression detective. He was familiar with the Minnie Street Lopers gang in particular from his contacts with members when he worked as a deputy sheriff in the jail, when he patrolled the area and when he transferred to the gang unit of the Santa Ana Police Department. Unlike the gang expert in *Mejia*,

nothing in Franks' testimony suggests that he was directly repeating what someone else told him about the Minnie Street Lopers during this or any other investigation. Rather, his testimony that gangs "control the narcotics trafficking in an area" by maintaining control "of selling drugs to buyers" and "of the money," and by requiring "other drug dealers in that area that are not part of that gang" to "pay what's called a tax to that gang," distilled and synthesized what he had learned through his experience. *See Mejia*, 545 F.3d at 197 (implying that the "synthesis of various source materials" constitutes permissible expert testimony).

More importantly, Franks did not impart this information for its own sake, but to explain the basis for his expert opinion that Salvador was "one of the leaders of the narcotics trade in Bishop Manor." He testified that he formed this opinion by reviewing the wiretapped telephone calls, learning that Salvador did not pay taxes to anybody in the neighborhood and applying his knowledge and experience of gang practices to deduce the significance of that information. He further applied this expertise to explain the meaning of a recorded phone call between Salvador and a friend, Walter, that was played for the jury. According to Franks, Walter told Salvador in the call that members of a rival gang believed Walter was "slinging for Salvador" within their territory and were looking for Salvador to verify that he had paid the required tax. Based on his knowledge that the leader of a neighborhood gang is generally responsible for paying taxes to a higher-ranking gang, Franks testified that the phone call further supported his opinion that Salvador was in charge of narcotics trafficking in Bishop Manor.

Franks' expert opinion therefore was not merely repackaged testimonial hearsay but was "an original product" that could have been "tested through cross-examination,"

*Gomez*, 725 F.3d at 1129 (quoting *Johnson*, 587 F.3d at 635), although the defendants declined to do so. Because Franks "appl[ied] his training and experience to the sources before him and reach[ed] an independent judgment," his testimony complied with *Crawford* and the Confrontation Clause. *Id.* (quoting *Johnson*, 587 F.3d at 635).

## B.  Rule 403

The defendants further contend that the district court did not balance the probative value of Franks' testimony against its unfair prejudice and that his testimony should have been excluded on this basis as well. Assuming without deciding that Franks' testimony should have been excluded under Rule 403, we conclude that any error in admitting the testimony was harmless. *See United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005) (holding that for nonconstitutional errors, we will not reverse when "it is more probable than not that the error did not materially affect the verdict" (quoting *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc)) (internal quotation marks omitted)).

First, because Franks' most damning testimony was cumulative, its impact on the jury was limited. Before Franks testified, the jury had already heard Reyes' testimony that Salvador was the highest-ranking member of the Minnie Street Lopers, that Salvador controlled all narcotics trafficking in Bishop Manor and that anyone who dealt drugs without his permission would be physically assaulted. This testimony was elicited without objection from the defense, and its admission has not been challenged on appeal. Admittedly, corroboration from law enforcement carries heavy weight, especially given that Reyes' testimony had been thoroughly impeached. Nevertheless, the jury had

already heard the most potentially inflammatory information from other sources.

Second, as to the conspiracy count, Franks' testimony could not have influenced the verdict because the defendants effectively conceded guilt. Armando's attorney stated in closing argument that "Armando Vera is not disputing that he distributed narcotics[.] That's a given." Salvador's attorney added that he would not "talk[] at all about guilt or innocence as to Count 1," but only about "quantity and types of drugs and whether the government met their burden of proof to prove those quantities."

Third, Franks' testimony did not materially affect the defendants' convictions for use of a minor in Counts 2 and 3 and the special verdict on the drug quantities. The far more specific testimony from Lavis and Reyes about the role of the defendants' minor nephew in the drug organization and the extensive testimony from Lavis regarding drug type and quantities overshadowed anything Franks may have contributed.[6]

Finally, we note that in one respect, Franks' gang testimony prejudiced one of the two defendants, Armando. Because there was no evidence that Armando, as opposed to Salvador, was a gang member, the gang testimony could have

---

[6] For the same reasons, the district court did not commit reversible error by failing to give, sua sponte, a limiting instruction regarding the purpose of the gang testimony. *See United States v. Teague*, 722 F.3d 1187, 1192 (9th Cir. 2013) (noting that to satisfy plain error review, a defendant must establish "that the error affected substantial rights," meaning that it "affected the outcome of the district court proceedings" (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)) (internal quotation marks omitted)).

influenced the jury to view Armando in an unfairly negative light. *See Kennedy v. Lockyer*, 379 F.3d 1041, 1055 (9th Cir. 2004) (noting that "evidence relating to gang involvement will almost always be prejudicial and will constitute reversible error"). But under the unique circumstances of this case, this possibility is not a reason to conclude that the admission of Franks' testimony was prejudicial error. Reyes also testified extensively about Salvador's gang ties and the activities of the Minnie Street Lopers gang, and neither defendant has challenged the admission of that testimony. Accordingly, Franks' testimony was not in itself the cause of any prejudice Armando may have suffered on that score. We further note that Armando could have, but did not, request a separate trial or even a limiting instruction to shield himself from the effects of the gang-related evidence.

\* \* \*

For these reasons, we hold the admission of Franks' gang expert testimony did not violate the defendants' Confrontation Clause rights and did not constitute reversible error under Rule 403.

### III.  Lavis' Testimony

We next consider whether admitting Lavis' testimony interpreting the recorded telephone calls was reversible error. The defendants argue his testimony was improper because it (1) impermissibly mixed lay and expert opinions; (2) served as a conduit for testimonial hearsay in violation of *Crawford*, 541 U.S. 36; (3) was not the product of reliable principles and methods; and (4) included impermissible lay opinions.

Although some of Lavis' opinions about the meaning of recorded phone calls were permissible, we agree with the

defendants that others were erroneously admitted, and that the district court's failure to instruct the jury in how to evaluate his testimony was plain error. After a careful review of the record, we conclude these errors warrant reversal of the jury's drug quantity findings, but not the defendants' convictions on Counts 1 through 3. We consider the appropriate remedy in Part IV, *infra*.

## A.  Legal Background

It is neither novel nor unusual for law enforcement officers to interpret the meaning of phone calls recorded as part of a narcotics investigation. Drug jargon is well established as an appropriate subject for expert testimony and investigating officers may testify as drug jargon experts who interpret the meaning of code words used in recorded calls. *See, e.g.*, *United States v. Bailey*, 607 F.2d 237, 240 (9th Cir. 1979). Officers may testify about their interpretations of "commonly used drug jargon" based solely on their training and experience. *See id.*; *see also United States v. Figueroa-Lopez*, 125 F.3d 1241, 1244–45 (9th Cir. 1997) (holding that law enforcement officer testimony that certain terms constituted code words for a drug deal was erroneously admitted as lay opinion testimony, but the error was harmless because the officer testified to facts supporting his qualifications as an expert and the testimony was proper expert opinion).

To interpret the meaning of coded language encountered for the first time in the specific investigation at issue, however, an officer's qualifications, including his experience with narcotics investigations and intercepted communications, are relevant but not alone sufficient to satisfy Federal Rule of Evidence 702. *See United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002). Rather,

Rule 702 requires district courts to assure that an expert's *methods* for interpreting the new terminology are both reliable and adequately explained. *See id.* at 1094. "[V]ague and generalized" explanations are not sufficient; rather, the officer must explain how he *applies* his "knowledge to interpret particular words and phrases used in particular conversations." *Id.* at 1094–95. For example, an agent may permissibly apply his knowledge of the drug manufacturing process to interpret words referring to that process or apply his familiarity with a particular method for generating code words to decode their meaning. *See, e.g.*, *United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009) (approving expert testimony interpreting terms the agent "knew to refer to the reagent used in the PCP manufacturing process"); *United States v. Decoud*, 456 F.3d 996, 1013–14 & n.6 (9th Cir. 2006) (approving the agent's explanation that he interpreted "diznerty" as slang for "dirty" based on his familiarity with a common speaking style that creates slang versions of specific words by adding "e" or "ez").

A law enforcement officer testifying as an expert in drug jargon may also testify as a lay witness if he was involved in the investigation. *See United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007). Such dual capacity testimony raises additional concerns, however: an agent's status as an expert could lend him unmerited credibility when testifying as a percipient witness, cross-examination might be inhibited, jurors could be confused and the agent might be more likely to stray from reliable methodology and rely on hearsay. *See id.* at 902–03 (citing *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003)); *see also United States v. York*, 572 F.3d 415, 425 (7th Cir. 2009); *United States v. Flores-De-Jesus*, 569 F.3d 8, 21 (1st Cir. 2009); *United States v. Conner*, 537 F.3d 480, 488 (5th Cir. 2008).

Because these risks are reduced "[i]f jurors are aware of the witness's dual roles," the jury must be instructed about "what the attendant circumstances are in allowing a government case agent to testify as an expert." *Freeman*, 498 F.3d at 904; *see also United States v. Martinez*, 657 F.3d 811, 817 (9th Cir. 2001) (approving admission of hybrid testimony when "the court instructed the jury three times on the difference between percipient and expert testimony"); *United States v. Anchrum*, 590 F.3d 795, 803–04 (9th Cir. 2009) (holding that the district court "avoided blurring the distinction between [the case agent's] distinct role as a lay witness and his role as an expert witness" when it "clearly separated [the agent's] testimony into a first 'phase' consisting of his percipient observations, and a second 'phase' consisting of his credentials in the field of drug trafficking and expert testimony regarding the modus operandi of drug traffickers"). Direct and cross-examination provide additional opportunities "to clarify in the eyes of the jury the demarcation between lay and expert testimony offered by the same witness." *Freeman*, 498 F.3d at 904; *see also Martinez*, 657 F.3d at 817 (noting that "[t]he government was nearly always exact in specifying when it was asking for [the agent's] testimony as an expert" in affirming admission of the agent's hybrid testimony).

Finally, a law enforcement officer involved in the investigation may offer lay opinions about the meaning of intercepted phone calls, but those opinions are subject to the requirements of Federal Rule of Evidence 701. *See Freeman*, 498 F.3d at 904–05. Rule 701 requires lay opinion testimony to be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Accordingly, an officer may not

testify based on speculation, rely on hearsay or interpret unambiguous, clear statements.  *See Freeman*, 498 F.3d at 905.  But he may interpret "ambiguous conversations based upon his direct knowledge of the investigation," including his "direct perception of several hours of intercepted conversations . . . and other facts he learned during the investigation."  *Id.* at 904–05; *see also United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014).

In sum, law enforcement officers may offer lay and expert opinions about the meaning of intercepted phone calls, but the foundation laid for those opinions must satisfy Rules 701 and 702, respectively.  Further, if a single officer offers both lay and expert testimony, the jury must be informed of the fact and significance of his dual roles.

## B.  Analysis

Applying these principles to this case, we hold it was plain error not to instruct the jury on how to appropriately evaluate Lavis' opinions and to fail to require an adequately specific foundation for those opinions.  Together, these errors undermine our overall confidence in the jury verdict in some respects.  If an appropriate foundation had been laid, the jury would at least have had the information it needed to evaluate Lavis' opinions.  If the jury had been instructed on how to evaluate Lavis' opinions, it would at least have known the rules governing how much weight to give those opinions.  The absence of *both* an adequately laid foundation and an appropriate instruction, however, substantially heightened the "risk that the jury [would] defer to the officer's superior knowledge of the case and past experiences with similar crimes."  *United States v. Hampton*, 718 F.3d 978, 981–82 (D.C. Cir. 2013).

The defendants' arguments for overturning their *convictions* for these reasons are not well taken, however, because the erroneously admitted testimony related most fundamentally to the evidence of drug quantity. Moreover, the defendants failed to object to Lavis' interpretive testimony generally and they failed to contemporaneously object to the specific quantity opinions they belatedly challenge on appeal. Whether the defendants' decisions were based on strategy or the result of oversight, they undermine the defendants' argument that the errors satisfy the plain error standard, warranting reversal of their convictions, because many of the problems could have been easily corrected had they been timely brought to the district court's attention.

Nonetheless, the ultimate responsibility for assuring the reliability of expert testimony and for instructing the jury on how to evaluate case agent dual role testimony rests with the district court. *See Freeman*, 498 F.3d at 904. Particularly when the district court indicated it would instruct the jury on how to evaluate Lavis' expert opinions, its failure to do so is not excused by the absence of a request from the defendants. Moreover, as the proponent of Lavis' testimony, the government "bears the burden of laying the proper foundation for [its] admission." *City of Long Beach v. Standard Oil Co. of Cal.*, 46 F.3d 929, 937 (9th Cir. 1995). Some of the responsibility must therefore be shouldered by the prosecution as well.

These general defects led to specific flaws in Lavis' testimony, mostly relating to the reliability of his methodology, which affected several of his opinions regarding specific *drug quantities*. Aside from the 24 grams of heroin Reyes purchased from Armando, Lavis' opinions interpreting the wiretapped calls were the only evidence of specific quantities at trial. Given the vital importance of

Lavis' opinions to those drug quantity findings, and of those findings to the defendants' substantial sentences, the foundational errors in Lavis' opinions, combined with our overall lack of confidence in the jury's ability to meaningfully evaluate his testimony, require us to vacate the jury's drug quantity findings. We affirm the remainder of the jury verdict, however, because the defendants have not established that their convictions were materially affected by these or any other errors in the proceedings.

### 1. *Procedural History*

The history of how Lavis came to be the key government witness on drug quantities is an important factor in our analysis. The government proffered him as an expert witness in its trial memorandum, filed the week before trial. The memorandum explained Lavis would also be testifying as a percipient witness about the investigation, specifically "the wiretap, the recorded calls, surveillances, and interviews he conducted," and potentially "his familiarity with the defendants." This proffer adequately disclosed Lavis as a witness who would be providing both lay and expert testimony. Additionally, its description of his anticipated expert testimony – that he would opine that the conspiracy involved quantities above certain threshold amounts; that he would interpret the meaning of certain words, code words and phrases used in the intercepted calls; and that he would testify as to the street values of narcotics, law enforcement techniques, drug trafficking activities in general and at Bishop Manor in particular – reasonably disclosed the contours of that testimony.

What the proffer did not reveal was that Lavis' testimony on drug jargon and drug quantity would include interpreting terminology he encountered for the first time in this

investigation and noncoded words (such as "that" or "one") used in particular contexts. As a consequence, the government did not disclose the methodology he would employ in doing so or, more generally, the foundation on which those opinions would rest. The proffer of his expertise rested solely on his general qualifications, training and experience: his employment as an agent of the FBI and his six years as a member of the Santa Ana Gang Task Force. The testimony elicited by the prosecutor on direct examination to support Lavis' expert opinions similarly focused on his general training and experience and his familiarity with this investigation in particular without discussing any expert methodology he would apply.[7] Up until Lavis actually began offering his opinions about the meaning of the intercepted calls, therefore, the defendants could have reasonably assumed that his drug quantity testimony would be limited to common code words for drugs that he learned through his training and experience.

On the first day of trial, the defendants filed written objections to Franks' proffered gang expert testimony and to two recorded phone calls the government intended to offer into evidence, which also related to the gang issues. They

---

[7] This testimony included that he had developed expertise in narcotics trafficking organizations and techniques for investigating them during his eight years of involvement in several wiretap investigations; that, during that time, he had listened to many telephone calls between narcotics traffickers; that, as to this investigation, he had reviewed all the calls the government would introduce into evidence, as well as other intercepted calls, primarily to identify the voices in the calls, as he could not understand Spanish beyond a few code phrases used in narcotics trafficking, and most of the calls were in Spanish; and that he had familiarity with code words used by traffickers "[t]o avoid detection by law enforcement" and confirmed that the defendants used code words throughout the intercepted calls.

explicitly disclaimed objecting "to portions of the notice regarding . . . use of 'code words,' [and] the street value of identified narcotics in the area at the time," although they reserved their "right to object depending upon the ultimate foundation," and their "right to object to any matters not specifically identified in the notice."  They objected in a footnote to any testimony of the form, "Defendant X is legally responsible for participating in a conspiracy to distribute Y amount of narcotics."  This objection was not based on foundation under 701 or 702 but on mental state under Federal Rule of Evidence 704(b).  The defendants did not raise any concerns about case agents testifying in both a lay and expert capacity, nor did they request further explanation of or the opportunity to explore Lavis' methodology or the foundation for his opinions.

The defendants did argue that expert reliance on "out-of-court statements of individuals such as informants and arrestees" constitutes "a repackaging of testimonial statements" that is "inadmissible under the Confrontation Clause."  When the district court heard oral argument on their written objections before testimony began on the third day of trial, the court acknowledged the defendants' standing *Crawford* objection, explaining their "*Crawford* position is preserved," but agreed with counsel's suggestion that they would contemporaneously object on all other issues.

On the merits of the defendants' objection, the court stated it would "be real tight on requiring compliance with 703," and would not "let an expert walk in hearsay." Significantly, the court further advised counsel that an expert could testify "to sources that an expert in that particular field could reasonably rely upon," and that it would at that time *instruct the jury* about "how they're to treat the expert testimony and distinguish between reliance on an opinion,

those facts not coming into evidence for the truth, as opposed to the expert stating the bases for his opinion, consider what he has said in terms of assessing opinion, not for the truth of the statements." No such instruction was ever given.

Aside from the standing *Crawford* objection, the defense affirmatively acquiesced to the admission of Lavis' drug quantity opinions. Defense counsel did specifically raise Lavis' drug quantity testimony as an issue with the court, characterizing that testimony as "critical to the case." The court explained Lavis would "have to have a percipient basis for that testimony." The government responded with an oral proffer regarding the type of opinions Lavis was expected to offer.[8] This proffer should have put the defendants on notice that Lavis would testify as to the meaning of, for example, the term "one" as opposed to common drug jargon, and that his opinions would be based in part "on the calls he has listened to and his knowledge of the investigation." Nevertheless, the defense agreed that the government could proceed to elicit Lavis' testimony and stated that such testimony would not be "per se, improper." The defense did request – and was granted – additional time to review the summary of Lavis' drug quantity opinions.

---

[8] The government explained:

> What I expect Special Agent Lavis to testify about is, you know, for example, Exhibit 5. There is reference to get one and cook it. He is going to opine that the call, based on his review of all the calls, that that call is about one ounce of crack cocaine. And he will opine that there's a series of calls on 5/13/08, all referencing the attempt to get one ounce of crack cocaine; and that is, he is going to opine based on the calls he has listened to and his knowledge of the investigation and the code words used in the calls.

Finally, during Lavis' testimony itself, the defense rarely objected to his opinions, and most of those objections were cured by rephrasing the question. This underscores that many of the problems the defendants identify on appeal could likely have been averted through contemporaneous objections before the district court.

## 2. *Instructional Error*

On this procedural record, we review the defendants' *Crawford* argument de novo, *see Gomez*, 725 F.3d at 1125, and their remaining arguments for plain error, *see* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 730–36 (1993).

In light of our Circuit's clearly expressed concerns about case agents testifying in both lay and expert capacities, the district court's failure to give an instruction explaining Lavis' dual roles was plain error. *See Freeman*, 498 F.3d at 904 (emphasizing "the necessity of making clear to the jury what the attendant circumstances are in allowing a government case agent to testify as an expert"). It is particularly plain given the district court's own statement that it would give an instruction telling the jury how to evaluate Lavis' expert opinion testimony.

The absence of such an instruction prejudiced the defendants by materially increasing the risk that the jury gave Lavis' testimony undue deference, a risk that is particularly acute with respect to the issue of drug quantity, for which – aside from 24 grams of heroin – his opinions comprised the sole evidence. Had the jury been instructed that the "facts" on which Lavis based his expert opinions should not be considered for their truth but only to assess the strength of his opinions, the jury would have been better able to question for

itself the reliability of Lavis' interpretations of wiretapped conversations. Likewise, if the court had instructed the jury that Lavis' lay opinion testimony was "not based on scientific, technical, or other specialized knowledge," Fed. R. Evid. 701(c), it would have deterred the jury from viewing Lavis' opinions as having the "imprimatur of scientific or technical validity." *Freeman*, 498 F.3d at 903. This is especially true as to Lavis' opinions that speakers' vague references such as "that, "one" or "what we talked about earlier" were linked to narcotics transactions.

Given the risk of undue deference from the jury, other errors in the record that might be individually harmless instead have a cumulative impact. For example, the "helpfulness" requirement of Rules 701 and 702 prohibits a witness from opining about the meaning of clear statements. *See id.* at 904–05 ("Although [an expert's] interpretation of ambiguous statements [is] permissible under Fed. R. Evid. 701, 'the interpretation of *clear* statements is not permissible, and is barred by the helpfulness requirement of both Fed. R. Evid. 701 and Fed. R. Evid. 702.'" (quoting *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988))).

Nevertheless, Lavis was at times called upon to interpret conversations that were well within the understanding of an ordinary juror.[9] Individually, such opinions did not prejudice the defendants – after all, they were impermissible because

---

[9] For example, Lavis explained that "bad" and "no good" meant that the product was of "poor quality" or "not good." Similarly, he interpreted the demand that a supplier "lower the price for you, fool, because tell her that it is a little expensive, fool," as meaning that "whatever she is selling it for, Mr. Vera probably feels it's a little more expensive than what he wants to pay for it, so he's trying to negotiate, maybe get the price lowered."

their meaning was *already* clear. Cumulatively, however, they may have encouraged the jury to defer to Lavis' opinions instead of listening to the calls and reaching an independent judgment. *See id.* at 903 (stating that "unnecessarily repetitive" testimony "may come dangerously close to usurping the jury's function") (quoting *Dukagjini*, 326 F.3d at 54). Particularly because the jury was uninformed about how to appropriately evaluate Lavis' opinion testimony, these errors further erode our confidence in the jury's verdict.

### 3. *Specific Drug Quantity Problems*

Having set forth our underlying concerns with the jury verdict generally, we next focus on drug quantity, the issue most seriously affected by the instructional error. Given the sentencing structure of the Controlled Substances Act, which imposes higher statutory sentencing ranges for offenses involving quantities above certain threshold amounts, *see* 21 U.S.C. § 841(b), it is not surprising that drug quantity was the primary issue the defendants contested at trial. Drug quantity was such a critical issue that, in closing, the defense variously characterized the jury's role as akin to "accounting," "arithmetic" or "a tax audit." Moreover, when multiple substances are at issue, what quantity is attributed to a particular drug type is also material because different threshold amounts are required for different substances; the highest statutory sentencing range, for example, requires an offense involving 5 kilograms of cocaine but only 280 grams of cocaine base. *See id.* § 841(b)(1)(A)(ii)–(iii). Accordingly, unreliable opinions attributing particular quantities of particular substances to the defendants pose a serious risk of prejudice to their substantial rights.

Careful review of the record shows that the general failure to assure an adequate foundation for Lavis' opinions resulted

in the admission of specific drug quantity opinions that did not rest on reliable methods. Even though the defendants forfeited the arguments they make on appeal by failing to contemporaneously object to any of this specific testimony, the district court plainly erred by allowing the admission of such testimony in the face of its "continuing responsibility of acting as the vigilant gatekeeper[] of expert testimony to ensure that it is reliable." *Freeman*, 498 F.3d at 904; *see also Dukagjini*, 326 F.3d at 53 (requiring "vigilance by the trial court . . . when an expert, who is also the case agent, goes beyond interpreting code words and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case").

For example, an agent's belief that the speaker is a trafficker of a particular substance does not satisfy Rule 702's requirement that expert opinions be based on reliable methodology. *See Hermanek*, 289 F.3d at 1096 (holding that the agent's interpretation of "cryptic language as referring to cocaine simply because he believed appellants to be cocaine traffickers" was "circular, subjective reasoning" that did "not satisfy the Rule 702 reliability requirement"). Yet Lavis relied on his belief that Manuel Duarte-Aguilera was a cocaine *base* dealer who provided ounce quantities to Salvador to interpret a reference to a "package of tortillas" as "one ounce of cocaine base," a substance that carries more severe sentencing consequences than *powder* cocaine. The flaw in this methodology was confirmed when the government later admitted that Lavis' assumption was actually *wrong*. After the close of its case, the government conceded by stipulation that this call actually "involved powder cocaine, not cocaine base, and that Manuel Duarte-Aguilera distributed both powder cocaine and cocaine base." Notwithstanding this stipulation, Lavis had relied on his assumption that Duarte-Aguilera was an ounce distributor of

cocaine base as a partial reason to infer that several other calls referred to ounce quantities of cocaine base. He employed this same methodology to interpret additional calls involving other individuals, testifying that Gloria Calderon supplied ounce quantities of cocaine base, that Javier Camacho supplied ounce quantities of cocaine base and that Ruben Orejel was a heroin dealer.

At other times, Lavis used the quoted price to deduce whether the conversations concerned cocaine powder or cocaine base. For example, he twice testified that the term "work" referred to cocaine base because the supplier quoted a price consistent with an ounce of cocaine base. There is nothing *inherently* unreliable about this methodology, but he later testified that the price range for an ounce of cocaine base and for powder cocaine is "roughly the same." If the price ranges for cocaine base and cocaine powder were roughly equivalent, Lavis' method for distinguishing them was not reliable.

Finally, in one instance, Lavis' opinion plainly rested on nothing more than speculation. The jury heard this conversation:

> [Phone ringing]
>
> ARMANDO: Hello?
>
> FILIPP: Hey, what's up man? Are you uh – are you around right now?
>
> ARMANDO: Yeah.
>
> FILIPP: Alright, can I come – can I come by?

ARMANDO: Yeah.

FILIPP: Okay, I'll be there in like ten minutes.

ARMANDO: Alright.

FILIPP: Alright, bye.

[End of conversation]

As the defendants point out, "[n]either direct nor encoded references were made that could be construed as a desire to purchase narcotics." Nevertheless, Lavis opined that, in this call, Filipp "was contacting Armando to obtain two ounces of heroin," and that those two ounces would be "20 grams each, so two would be 40 grams," because that is what he "knew [Filipp] to get in the investigation." This opinion could not have been "rationally based on the witness's perception," Fed. R. Evid. 701(a), because Lavis' knowledge that Filipp had obtained 40 grams of heroin from Armando on other occasions does not support the inference that *this* call – which includes no inculpatory, ambiguous or coded statements – was about his desire to do so again. Surveillance confirmed that Filipp visited Bishop Manor after similar calls, but it is pure speculation to equate a visit with the purchase of 40 grams of heroin, specifically. Such speculation is inadmissible testimony whether characterized as lay opinion, expert opinion or anything else, and its admission constituted plain error.[10]

---

[10] There is also reason to suspect that Lavis' lay opinion at times rested on testimonial hearsay, violating the defendants' Confrontation Clause rights under *Crawford*, although the record does not allow a conclusive determination. Lavis frequently opined about the meaning of ambiguous

The government argues that this court's recent decision in *United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014), requires a finding that Agent Lavis' direct knowledge of the investigation established sufficient foundation for the admission of his testimony, including the conclusions about drug quantity. But *Gadson* is distinguishable: it did not involve a qualified expert slipping into lay opinion without a proper jury instruction, nor did it involve such obvious flaws in the foundation for the officer's conclusions on specific drug quantities.

\* \* \*

Because the jury was not instructed on how to evaluate Lavis' dual role in giving his drug quantity opinions and because the general failure to establish a foundation under Rules 701 and 702 for those opinions led to the admission of plainly erroneous drug quantity testimony, we hold the defendants have established that plain errors affected the jury's drug quantity findings. The defendants' lengthy

---

statements based on what he knew "about the investigation," or "a number of factors in the investigation." But his knowledge "about the investigation" included some sources that constitute testimonial hearsay (interviews with informants) and others that do not (intercepted conversations). Lavis' lay opinions based on his knowledge of the investigation therefore might have relied on and conveyed impermissible testimonial hearsay. For example, he testified that a "piece" of heroin is typically 25 grams, but that he knew "based on the investigation" that Fillip, a customer of the defendants, used the term "piece" to mean 20 grams. Given that the recorded telephone calls available for our review were almost never so specific about quantity, this testimony at least raises a suspicion that Lavis' testimony relied in part on interviews or interrogations associated with the investigation, constituting testimonial hearsay in violation of *Crawford*. Because we conclude that other errors warrant vacating the drug quantity findings, however, we need not conclusively resolve the issue.

sentences depended on those drug quantity findings, so the errors seriously affected the fairness of the proceedings and we exercise our discretion to correct them.  *See Olano*, 507 U.S. at 735–36.

## IV.  Remedy

Having concluded that only the jury's drug quantity findings were affected by plain error, we turn to the question of remedy.  Because the special verdict included the jury's tainted drug quantity findings, we must vacate that portion of the special verdict.  Without those findings, the drug types and quantities used to establish the defendants' statutory sentencing ranges under 21 U.S.C. § 841(b) were not proven beyond a reasonable doubt.  Sentencing the defendants using that statutory range therefore violated the Sixth Amendment. *See Alleyne v. United States*, 133 S. Ct. 2151, 2163 (2013) (holding that "facts that increase mandatory minimum sentences must be submitted to the jury and found beyond a reasonable doubt").  Accordingly, we must also vacate the defendants' sentences.

We next confront what appears to be a question of first impression in this circuit: What is the appropriate remedy when a jury finds beyond a reasonable doubt facts that increase a defendant's statutory sentencing range, but the jury's finding was affected by trial error?  Specifically, we consider whether we must (1) vacate the entire conspiracy conviction and remand for a full retrial of Count 1; (2) vacate only the drug quantity findings in the special verdict, deny the government the option of retrying the drug quantity issue and require resentencing based solely on the defendants' convictions; or (3) vacate only the drug quantity findings in the special verdict, but allow the government to resubmit the

drug quantity questions to a sentencing jury.[11]  We conclude the last option is the appropriate procedure.

First, vacating the jury's drug quantity findings does not require us to vacate the conspiracy conviction itself.  The tainted drug quantity verdict does not affect the validity of the underlying conspiracy conviction because drug quantity was not an element of the charged conspiracy offense; rather, it was the "functional equivalent of an element" that had to be submitted to a jury and proved beyond a reasonable doubt for the purposes of sentencing alone.  *United States v. Toliver*, 351 F.3d 423, 430 (9th Cir. 2003) (internal quotation marks omitted), *abrogated on other grounds by Blakely v. Washington*, 542 U.S. 296 (2004); *cf. United States v. Thomas*, 355 F.3d 1191, 1195 (9th Cir. 2004) (explaining that "drug type and quantity are not elements of the offense under [21 U.S.C.] § 841"); *United States v. Minore*, 292 F.3d 1109, 1117 (9th Cir. 2002) (noting that "a finding of drug quantity is not necessary to convict [the defendant] of violating [21 U.S.C. §] 841(a)").

Second, the Double Jeopardy Clause does not preclude the government from retrying the drug quantity issue in this case.   The Double Jeopardy Clause bars retrial where insufficient evidence supported a conviction, but not where, as here, trial error affected the jury's determination.  *See Lockhart v. Nelson*, 488 U.S. 33, 38 (1988) (holding that the government may retry a defendant who successfully challenges his conviction based on "some error in the proceedings leading to conviction"); *Burks v. United States*, 437 U.S. 1, 18 (1978) (holding that the government may not

---

[11] Following oral argument, we requested supplemental briefing on this question.

retry a defendant when the prosecution introduces insufficient evidence to support his initial conviction). Here, as set forth in the concurrently filed memorandum disposition, sufficient evidence supports the jury's drug quantity findings, although some of that evidence was improperly admitted. Thus, the Double Jeopardy Clause does not prohibit retrial.

This conclusion is consistent with our previous case law requiring resentencing within the lower statutory sentencing range supported by a generic conviction. In the wake of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), we decided several cases where the defendants had been convicted of generic controlled substance offenses, were sentenced based on judicial determinations of drug type or quantity and challenged those sentences as violative of their Sixth Amendment rights under *Apprendi*. *See id.* at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). In such cases, we vacated the defendants' sentences and remanded for resentencing within the lower statutory ranges applicable to their generic convictions – without giving the government the opportunity to submit the drug type and quantity questions to a jury. *See, e.g.*, *Thomas*, 355 F.3d at 1202 (remanding with instructions to resentence the defendant based on an unspecified quantity of cocaine base when the defendant had admitted during the plea colloquy that he knowingly possessed cocaine base with the intent to distribute without admitting to a specific quantity); *United States v. Banuelos*, 322 F.3d 700, 706 (9th Cir. 2003) (remanding "with instructions to the district court to resentence Banuelos subject to the maximum sentence supported by the facts found by the fact-finder beyond a reasonable doubt") (internal quotation marks omitted); *United States v. Velasco-Heredia*, 319 F.3d 1080, 1086–87 (9th Cir.

2003) (holding that, having established that the defendant was guilty of a conspiracy for an unspecified amount of marijuana, double jeopardy barred the government from proving the quantity of marijuana beyond a reasonable doubt).

In those cases, however, the government did not attempt to prove drug type or quantity beyond a reasonable doubt, but instead relied on plea colloquys in *Thomas* and *Banuelos*, and in *Velasco-Heredia*, on the facts found in a bench trial that did not specify the quantity of drugs. Accordingly, there was insufficient evidence – none – presented to a jury to support a finding beyond a reasonable doubt of the facts increasing the statutory range. The government had therefore effectively forfeited "its opportunity to prove beyond a reasonable doubt that [the defendant] was responsible for [a particular quantity of drugs]." *Velasco-Heredia*, 319 F.3d at 1086. Here, in contrast, the government took full advantage of its opportunity, and the jury found that the government met its burden of proving certain drug quantities. The defendants have now successfully challenged those findings, but only "because of some error in the proceedings" that rendered the proof *invalid*, not necessarily *lacking*. *Lockhart*, 488 U.S. at 38. The Double Jeopardy Clause therefore poses no bar to retrying the drug quantity issue.

Third, vacating only the drug quantity findings in the special verdict and affording the government an opportunity to retry the issue accords with recent Supreme Court authority. In *Alleyne*, the Supreme Court explained that "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of *a new offense* and must be submitted to the jury." 133 S. Ct. at 2162 (emphasis added); *see also id.* (holding that "because the fact of brandishing aggravates the

legally prescribed range of allowable sentences, it constitutes an element of a *separate, aggravated offense* that must be found by the jury" (emphasis added)); *id.* at 2162–63 ("The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a *distinct and aggravated crime.*" (emphasis added)).

*Alleyne* suggests that facts increasing the statutory sentencing range should be analogized to criminal statutes increasing the punishment for individuals who commit underlying predicate crimes in specific ways. *See, e.g.*, 18 U.S.C. § 924(c) (providing that if, during and in relation to the commission of a crime of violence or drug trafficking crime, the defendant uses, carries or possesses a firearm in furtherance of the predicate offense, the district court must add a consecutive sentence to the punishment for the predicate offense); 18 U.S.C. § 1028A (providing that when a defendant, during and in relation to certain predicate offenses, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person," the district court must generally impose a 2-year term of imprisonment to run consecutive to the sentence for the predicate offense). When a conviction for such an aggravated offense is vacated for trial error, the government has an opportunity to retry the defendant for the aggravating offense alone. *See, e.g.*, *United States v. Anderson*, 89 F.3d 1306, 1315 (6th Cir. 1996) (affirming conviction on predicate drug offense but vacating conviction under 18 U.S.C. § 924(c) for erroneous jury instructions and remanding "for a new trial or resentencing"); *United States v. Manning*, 79 F.3d 212, 223 (1st Cir. 1996) (affirming conviction on predicate drug offense, but vacating conviction of 18 U.S.C. § 924(c) and remanding for a new trial). Our approach is consistent with this analogy.

In concluding that only the drug quantity findings must be vacated, we decline to follow the remedy adopted by the First Circuit in *United States v. Delgado-Marrero*, 744 F.3d 167 (1st Cir. 2014), and the Fourth Circuit in *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005). In those cases, the district courts gave erroneous jury instructions regarding how to calculate the drug quantities attributable to the defendants as part of their conspiracy convictions. *See Delgado-Marrero*, 744 F.3d at 189; *Collins*, 415 F.3d at 314. The errors invalidated the defendants' sentences, but did not affect their underlying conspiracy convictions. *See Delgado-Marrero*, 744 F.3d at 190; *Collins*, 415 F.3d at 314. Without the special verdicts, the defendants were subject "to the default statutory range of penalties under § 841(b)(1)(C), regardless of the drug quantity involved." *Delgado-Marrero*, 744 F.3d at 192; *accord Collins*, 415 F.3d at 315. But because the error was instructional, "the Double Jeopardy Clause d[id] not prohibit retrial." *Delgado-Marrero*, 744 F.3d at 192. We agree with the First and Fourth Circuits' analyses up to this point.

To remedy these errors, however, the First and Fourth Circuits withheld judgment and gave the government a short period to select one of two outcomes: (1) affirm the conspiracy conviction and remand for resentencing under the default penalty, or (2) vacate the conspiracy conviction and remand for a new trial. *See id.* at 193; *Collins*, 415 F.3d at 315. In doing so, *Delgado-Marrero* and *Collins* imported a remedy crafted for distinguishable cases to the circumstances we confront here.

The *Delgado-Marrero* and *Collins* remedy was originally, and appropriately, adopted when (1) a defendant was convicted of a conspiracy charge alleging multiple objects of the conspiracy, at least one of which increased the statutory

sentencing range, (2) the jury did not specify which object supported the conviction, but (3) the defendant was sentenced using the increased statutory range determined through judicial factfinding. *See United States v. Rhynes*, 196 F.3d 207, 237–40 (4th Cir. 1999), *rev'd on other grounds* 218 F.3d 310 (4th Cir. 2000) (en banc); *United States v. Garcia*, 37 F.3d 1359, 1371 (9th Cir. 1994), *receded from by United States v. Jackson*, 167 F.3d 1280 (9th Cir. 1999); *United States v. Quicksey*, 525 F.2d 337, 340–41 (4th Cir. 1975). The government was allowed to choose between affirming the convictions and resentencing the defendants based on the conspiratorial object with the lowest statutory sentencing range, or vacating the conspiracy convictions and remanding for retrial with a special jury verdict. *See Rhynes*, 196 F.3d at 239–40; *Garcia*, 37 F.3d at 1371; *Quicksey*, 525 F.2d at 341. Under such circumstances, retrial was possible only if the conspiracy convictions were vacated. Because the government must prove "the requisite intent to commit the substantive crime," *United States v. McCaleb*, 552 F.3d 1053, 1058 (9th Cir. 2009) (quoting *United States v. Sullivan*, 522 F.3d 967, 976 (9th Cir. 2008)), the object of a conspiracy is an essential element of a conspiracy offense. *Cf. United States v. Arlt*, 252 F.3d 1032, 1034 (9th Cir. 2001) (en banc) (holding "that the specific offense designated as the object of a conspiracy in a [18 U.S.C.] § 371 indictment does constitute an element of the offense"); *United States v. Alerta*, 96 F.3d 1230, 1235–36 (9th Cir. 1996) (adopting a similar remedy when the jury was not asked to decide whether the defendant used a machine gun, as opposed to any other sort of gun, during and in relation to his drug trafficking offense under 18 U.S.C. § 924(c) because whether the firearm was fully automatic "is an element of the crime"), *overruled on other grounds by Arlt*, 252 F.3d 1032.

Here, in contrast, the tainted drug quantity findings were not elements of the defendants' conspiracy conviction, as explained earlier. There is accordingly no reason to vacate the entire conspiracy conviction, guilt for which the defendants barely contested, if at all. If on remand the government elects to retry the drug quantity issue, the district court may empanel a sentencing jury. Sentencing juries and other bifurcated proceedings are not unknown to the federal criminal justice system. *See, e.g.*, *Jones v. United States*, 527 U.S. 373, 376–77 (1999) (describing the "separate sentencing hearing" required in capital cases, during which the "sentencing jury" must determine whether the government has established any of the statutory aggravating factors necessary to support a death sentence); *United States v. Pena*, 742 F.3d 508, 515 (1st Cir. 2014) (noting that "the question of guilt is often bifurcated from the question of criminal forfeiture").

By proceeding in this manner, we vacate only what was affected by error: the jury's drug quantity findings expressed in the special verdict and the defendants' sentences. On remand, the government may elect to retry the drug quantity issue before a sentencing jury, or it may request that the district court resentence the defendants under the default sentencing provisions in 21 U.S.C. § 841(b)(1)(C).**[12]**

---

**[12]** In their supplemental briefing, the defendants contend that any resentencing based on their convictions must proceed under 21 U.S.C. § 841(b)(3), the provision that applies to unspecified drug types, rather than 21 U.S.C. § 841(b)(1)(C). We disagree. We required resentencing under § 841(b)(3) in *United States v. Hunt*, 656 F.3d 906 (9th Cir. 2011), because the defendant admitted during the plea colloquy that he intended to possess and to distribute only an *unspecified substance*. *See id.* at 912–13, 916–17. Here, in contrast, the jury was instructed that it could convict the defendants on the conspiracy count only by finding that "there was an agreement between two or more persons to distribute *heroin,*

## V. Conclusion

We vacate the defendants' sentences and the special verdict, and remand for further proceedings consistent with this opinion.  We affirm the remainder of the defendants' convictions.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED.**

---

*cocaine, or cocaine base*."  By convicting the defendants on Count 1, the jury found beyond a reasonable doubt that the conspiracy involved an unspecified quantity of at least one of those three substances. Accordingly, the defendants' conspiracy convictions, standing alone, warrant sentencing under 21 U.S.C. § 841(b)(1)(C), which applies to unspecified quantities of these three substances. *See also* 21 U.S.C. § 812 scheds. I(b)(10), II(a)(4).