**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

YI-CHI SHIH, AKA Yichi Shih, AKA Yugi Shi,

*Defendant - Appellant*.

No. 23-3718

D.C. No.
2:18-cr-00050-JAK-1

OPINION

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted October 8, 2024
Pasadena, California

Filed October 25, 2024

Before: Richard A. Paez, Jacqueline H. Nguyen, and
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

# SUMMARY[*]

## Criminal Law

The panel affirmed a sentence in a case which the district court applied a base offense level of 26 pursuant to U.S.S.G. § 2M5.1(a)(1) to a count on which a jury found Yi-Chi Shih, a UCLA electrical engineering professor, guilty of violating the International Emergency Economic Powers Act (IEEPA).

Shih violated the IEEPA by exporting to the People's Republic of China, without a license, monolithic microwave integrated circuits (MMICs), devices that amplify microwave signals. The offense arose out of Shih's collaboration with engineers in China in conducting research for a Chinese enterprise that develops military weapons.

The base offense level of 26 prescribed in § 2M5.1(a)(1) applies if national security controls were evaded.

Shih argued that the Export Control Classification Numbers (ECCNs) associated with his MMICs are foreign policy controls, not national security controls, because they were added to a Bureau of Industry and Security (BIS) Commerce Control List (CCL) to satisfy this country's treaty obligations under the Wassenaar Arrangement (WA). The panel rejected this argument because, even if these ECCNs were added to the CCL to comply with the WA, it does not follow that the ECCNs cannot also be national security controls. The panel noted that (1) the treaty signatories'

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reasons for subjecting them to regulation included the promotion of responsibility and transparency in the global arms trade and the prevention of destabilizing accumulations of conventional weapons, and (2) the BIS's listed reasons for control were national security, missile technology, nuclear nonproliferation, and anti-terrorism. Thus, the district court did not err in finding that the export controls Shih evaded were implemented for national security reasons.

Shih also argued that the base offense level of 14 prescribed in § 2M5.1(a)(2) applies because the two-tiered structure of § 2M5.1(a) implies that the evasion of national security controls must involve conduct as egregious as the other conduct penalized by the higher base offense level. The panel rejected this argument as well as Shih's attempts to cast his conduct as a recordkeeping or reporting offense.

## COUNSEL

Khaldoun Shobaki (argued), Assistant United States Attorney, Chief, Cyber & I.P. Crimes Section; Daniel G. Boyle, Robert I. Lester, Melanie A. Sartoris, and David R. Friedman, Assistant United States Attorneys; Bram M. Alden, Assistant United States Attorney, Chief, Criminal Appeals Section; E. Martin Estrada, United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

Michael A. Brown (argued) and James W. Spertus, Spertus Landes & Josephs LLP, Los Angeles, California, for Defendant-Appellant.

# OPINION

HURWITZ, Circuit Judge:

The issue is whether the district court erred by finding that "national security controls . . . were evaded" by the conduct underlying one of the counts for which Yi-Chi Shih was convicted after a jury trial. The district court's finding triggered a base offense level of 26 under U.S.S.G. § 2M5.1(a)(1), rather than the base offense level of 14 otherwise applicable under U.S.S.G. § 2M5.1(a)(2). We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742 and find no error.

## BACKGROUND

### I.  The Regulatory Scheme

The International Emergency Economic Powers Act ("IEEPA") authorizes the President to issue Export Administration Regulations (the "Regulations") requiring that a license be obtained for the export of certain items. *See* 50 U.S.C. § 1704. A violation of the Regulations is also a violation of the IEEPA. 50 U.S.C. § 1705(a), (c). Items requiring a license under the Regulations are assigned an Export Control Classification Number ("ECCN") by the Bureau of Industry and Security ("BIS") on a Commerce Control List ("CCL"). *See* 15 C.F.R. Part 774, Supp. 1 (2024). The CCL provides "reasons for control" for each ECCN, including proliferation of chemical and biological weapons, nuclear nonproliferation, national security, missile technology, regional stability, crime control and detection, and anti-terrorism. *See* 15 C.F.R. §§ 742.2-742.9. If an item covered by an ECCN has a reason for control that is also checked for a country on BIS's Country Chart, a license is

needed to export that item to that country. *See* 15 C.F.R. § 738, Supp. 1 (2024).

## II.  Shih's Export of the MMICs

Shih, an electrical engineering professor at the University of California, Los Angeles, collaborated with engineers in the People's Republic of China in conducting research for China Avionics Systems Co. Limited ("AVIC"), a Chinese enterprise that develops military weapons. The project involved designing and producing monolithic microwave integrated circuits ("MMICs"), devices that amplify microwave signals.

Shih asked a co-conspirator, Kiet Mai, to approach Cree, a United States-based foundry, and, without disclosing Shih's involvement, arrange for manufacture of the MMICs. Cree required the completion of an export questionnaire. Mai forwarded the questionnaire to Shih, who completed it, but it was submitted to Cree under Mai's name. Shih affirmed on this questionnaire that any MMICs manufactured by Cree would not be subject to export control regulations. He also wrote "N/A" when asked whether the product would be shipped outside of the U.S.

Using Cree's portal, Shih and his Chinese colleagues then designed the MMICs. Cree then manufactured the MMICs to their specifications, and the MMICs were exported to China. It was later determined that the MMICs' outputs subjected them to export control regulations.

## III.  Procedural History

Shih was charged in an 18-count indictment with various offenses arising out of the export of the MMICs. The count relevant to this appeal, Count Two, charged a violation of the IEEPA because the MMICs were covered by the

Regulations, assigned ECCNs that listed national security as a reason for control, and that same reason was checked for China on the Country Chart. 15 C.F.R. Part 774, Supp. 1, Cat. 3 (2013).[1] After a jury returned guilty verdicts on all counts, the district court initially entered a judgment of acquittal on Counts One (alleging conspiracy to violate the IEEPA) and Two (alleging the substantive violation), finding the government had not shown that a license was required to export the MMICs. Upon reconsideration, however, the court reinstated the Count One verdict, finding sufficient evidence to support another object of the alleged multi-object conspiracy.

At sentencing, the parties agreed that the Guideline governing an IEEPA violation is § 2M5.1, which states:

> (a) Base Offense Level (Apply the greater):
>
>    (1) 26, if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism; or
>
> (2) 14, otherwise.

The district court declined to apply the higher base offense level to Count One because it had overturned the guilty verdict for Count Two, which alleged the substantive IEEPA violation. After the district court grouped the various

---

[1] All references to ECCNs are to the Code of Federal Regulations in effect during the relevant period – October 15, 2013, through June 4, 2014.

offenses, the advisory guideline range was 46 to 57 months. Shih was sentenced to 63 months. Both Shih and the government appealed, and we reinstated the conviction on Count Two, affirmed the convictions on all other counts, and remanded for resentencing. *See United States v. Shih*, 73 F.4th 1077, 1089 (9th Cir. 2023).

On remand, the government argued that the 26 base offense level in § 2M5.1(a)(1) applied to Counts One and Two because Shih's conduct evaded national security export controls. Shih argued the 14 base offense level applied because the MMICs were export-controlled for foreign policy reasons, not national security reasons. The district court accepted the government's argument, noting that one of the "reasons for control" listed for the relevant ECCNs – 3A001.b.2.b and 3A001.b.2.c – was "national security." *See* 15 C.F.R. Part 774, Supp. 1, Cat. 3. The court then calculated the total offense level for Counts One and Two as 30, making this group the one with the highest offense level. The resulting advisory guideline range was 97-120 months. Shih was sentenced to concurrent 85-month sentences on Counts One and Two and lesser concurrent sentences on the other sixteen counts. Shih again appealed.

## DISCUSSION

We review the district court's interpretation of the Sentencing Guidelines de novo, *see United States v. Herrera*, 974 F.3d 1040, 1047 (9th Cir. 2020), but must "give due deference to the district court's application of the guidelines to the facts," 18 U.S.C. § 3742(e)(4). The Guidelines are "interpreted using the ordinary tools of statutory interpretation." *Herrera*, 974 F.3d at 1047 (cleaned up). We therefore first look at the text and examine "the structure of the guidelines as a whole to understand the

provision in context." *Id.* We may also look to the commentary and Application Notes for "guidance" and consider the provision's "history, purpose, and the reasons for any relevant amendments." *Id.*

The higher base offense level in U.S.S.G. § 2M5.1(a)(1) applies if "national security controls . . . were evaded." The term "national security controls" is not defined by the Guidelines, the Commentary, or the Application Notes. Shih contends that our decision should be guided by the Export Administration Act of 1979 ("EAA"), under which the Regulations were originally promulgated. 50 U.S.C. App. § 2402(2).[2] Under the EAA, export controls can be imposed on items (1) that "would make a significant contribution to the military potential of any other country . . . which would prove detrimental to the national security of the United States," (2) "where necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations," and (3) "where necessary to protect the domestic economy from the excessive drain of scarce materials." 50 U.S.C. App. § 2402(2)(A)-(C).

Shih argues that the ECCNs associated with his MMICs are foreign policy controls, not national security controls, because they were added to the CCL to satisfy this country's treaty obligations under the Wassenaar Arrangement ("WA"). *See* 88 Fed. Reg. 12108 (Feb. 24, 2023). But, even if these ECCNs were added to the CCL to comply with the WA, it does not follow that the ECCNs cannot also be national security controls. Indeed, the treaty's signatories had reasons for defining the items covered and subjecting

---

[2] When the EAA lapsed, *see* 50 U.S.C. § 2419 (2001), the President used his IEEPA authority to keep the Regulations in effect, *see* Exec. Order No. 13,222, 66 Fed. Reg. 44025 (Aug. 17, 2001).

them to regulation. These included the promotion of "responsibility and transparency in the global arms trade" and the prevention of "destabilizing accumulations of conventional weapons." *Id.* The BIS also assigns specific "reasons for control" to each ECCN. *See* 15 C.F.R. §§ 742.2-742.9; 15 C.F.R. Part 774, Supp. 1, Cat. 3. And, the listed reasons for control for the relevant ECCNs during the period of Shih's conduct were (1) national security, (2) missile technology, (3) nuclear nonproliferation, and (4) anti-terrorism. 15 C.F.R. Part 774, Supp. 1, Cat. 3. Thus, the district court did not err in finding that the export controls Shih evaded were implemented for national security reasons.

Shih also contends the lower base offense level applies because the two-tiered structure of § 2M5.1(a) implies the evasion of national security controls must involve conduct as egregious as the other conduct penalized by the higher base offense level — evasion of "controls relating to the proliferation of nuclear, biological, or chemical weapons or materials," or offenses involving "a financial transaction with a country supporting international terrorism." U.S.S.G. § 2M5.1(a)(1). The district court correctly rejected this surplusage argument.

We have previously held that the higher base offense level in § 2M5.1(a)(1) applied when the defendant evaded national security controls by exporting thermal imaging cameras without a license, conduct not as egregious as the ones mentioned in that subsection. *United States v. Liang*, 537 Fed. App'x 710, 711 (9th Cir. 2013). Similarly, the First Circuit has applied § 2M5.1(a)'s higher base offense level when the defendant attempted to ship computer equipment to Libya without a license. *United States v. McKeeve*, 131 F.3d 1, 5-6 (1st Cir. 1997). In *McKeeve*, the court rejected the defendant's argument that the higher offense level could

not apply unless the government proved that the specific goods "constitute an actual threat to national security." *Id.* at 14. In so doing, the First Circuit declined to "substitute the judgment of a factfinder for that of the executive branch" about which exports threaten national security. *Id.* Although *McKeeve* mainly involved an Executive Order concerning exports to Libya, its teaching is relevant, for Shih effectively asks us to rewrite the executive branch's reasons for the ECCNs at issue. "Such a course is fraught with separation-of-powers perils," and "we eschew it." *Id.*

To be sure, the Sentencing Commission has recognized that developing guidelines for "administratively-related criminal violations" can pose difficult problems, particularly when attempting to distinguish between a mere failure to comply with regulatory requirements and the harm that can stem from that violation. U.S.S.G. Pt. A, Introductory Commentary § 1.4(f). But the Commission addressed this particular problem by "provid[ing] a low base offense level" for simple "recordkeeping or reporting offense[s]," while allowing "substantive harms that do occur in respect to some regulatory offenses, or that are likely to occur, [to] increase the offense level." *Id.*

And, Shih's attempts to cast his conduct as one of these "recordkeeping or reporting offenses" is plainly unavailing. It is undisputed that Shih "had business dealings with" a Chinese company whose "business involved missiles." *Shih*, 73 F.4th at 1098. Shih also hid his identity from Cree, falsely wrote "N/A" when asked whether the product would be shipped outside of the U.S., and represented that the MMICs were not subject to export controls. The evidence thus amply supports the district court's conclusion that this was not a mere recordkeeping offense. Rather, Shih's conduct triggers the Sentencing Commission's very concerns about the

"substantive harms" associated with criminal regulatory offenses that warrant the higher base offense level.

## CONCLUSION

We **AFFIRM** the judgment of the district court.